## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re: | : | |
| | : | Chapter 11 |
| **WINDSOR CONSTRUCTORS** | : | |
| **INCORPORATED,** | : | |
| | : | Bky No. 03-36589 (KJC) |
| Debtor. | : | |
| | : | |
| | : | |
| **WINDSOR CONSTRUCTORS** | : | |
| **INCORPORATED,** | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| **GIRTMAN & ASSOCIATES, INC.** | : | Adversary Proc. No. 04-158 (KJC) |
| | : | |
| Defendant | : | |

## MEMORANDUM[1]

### BY: KEVIN CAREY, UNITED STATES BANKRUPTCY JUDGE

On November 12, 2003, Windsor Constructors, Inc. (the "Debtor") filed a voluntary

chapter 11 bankruptcy petition. On February 4, 2004, the Debtor commenced this adversary

proceeding by filing a complaint against Girtman & Associates, Inc. ("Girtman"), alleging that

three transfers, in the total amount of $87,733.14, made by the Debtor to Girtman within ninety

days prior to the bankruptcy petition date, should be avoided as preferences pursuant to

Bankruptcy Code §547(b). 11 U.S.C. §547(b).

---

[1] This Memorandum constitutes the findings of fact and conclusions of law required by Fed. R.
Bankr. P. 7052. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and §157(a).
This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (b)(2)(F).

On April 8, 2005, Girtman filed a Motion for Summary Judgment ("Girtman's Summary

Judgment Motion"), arguing that the transfers in question were made in the ordinary course of

business and cannot be avoided pursuant to Bankruptcy Code §547(c)(2). 11 U.S.C. §547(c)(2).

On May 31, 2005, the Debtor filed a response in opposition to Girtman's Summary Judgment

Motion and a cross-motion for summary judgment (the "Debtor's Cross-Motion for Summary

Judgment"). On June 6, 2005, Girtman filed a motion to strike the Debtor's Cross-Motion for

Summary Judgment. On June 17, 2005, the Debtor filed a response opposing the motion to

strike and, on the same date, Girtman filed a motion in limine to preclude expert testimony.

Oral argument regarding the various motions was held on July 13, 2005. At oral

argument, the Court denied Girtman's motion to strike the Debtor's Cross-Motion for Summary

Judgment. (Tr. at 10).[2] For the reasons set forth below, Girtman's Motion for Summary

Judgment will be granted, the Debtor's Cross-Motion for Summary Judgment will be denied, and

Girtman's motion in limine will be denied as moot.

## FACTS

The following facts are largely undisputed: The Debtor and Girtman are companies

working in the construction industry. Since 1998, Girtman has supplied the Debtor with products

for the Debtor's construction projects, such as doors, frames and related hardware.

Beginning in 2001, the Debtor worked on several projects for ESA Services, Inc. ("ESA")

involving the construction of Extended Stay America hotels. One project was located in

Plymouth Meeting, Pennsylvania (the "Plymouth Meeting Project") and, during the period just

prior to the bankruptcy filing, the Plymouth Meeting Project was the Debtor's largest project.

---

[2]Citations are made to the transcript of the hearing on July 13, 2005.

In August 2003, the Debtor received a progress payment from ESA (the "August

Payment"). From the August Payment, the Debtor paid three of Girtman's outstanding invoices

(the "Transfers"), as follows:

| Date of Invoice | Check Date[3] | Payment Date | Amount |
|---|---|---|---|
| July 3, 2003 | Aug. 12, 2003 (40 days) | Aug. 25, 2003 (53 days) | $175.43 |
| June 19, 2003 | Aug. 15, 2003 (58 days) | Aug. 28, 2003 (70 days) | $29,697.87 |
| June 30, 2003 | Aug. 15, 2003 (46 days) | Aug. 28, 2003 (59 days) | $57,859.84 |
| | | TOTAL | $87,733.14 |

## STANDARD - SUMMARY JUDGMENT

Summary judgment is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c), made applicable to this adversary proceeding by Fed.R.Bankr.P.

7056. In a motion for summary judgment, the moving party "always bears the initial

responsibility of informing the...court of the basis for its motion, and identifying those portions

of 'the pleadings, depositions, answers to interrogatories and admissions on file, together with

---

[3]In §547(b) cases involving payment by ordinary check, the date of the "transfer," as defined in
§101(54), is the date the check is honored by the drawee bank. *Barnhill v. Johnson,* 503 U.S. 393, 400
112 S.Ct. 1386, 118 L.Ed.2d 39 (1992). The *Barnhill* Court noted, however, that a number of Courts of
Appeals have concluded that, for §547(c) defenses, the transfer is considered to occur on the date of
delivery of a check. *Barnhill,* 503 U.S. at 402, n. 9 (listing cases). The *Barnhill* Court expressed no view
on the definition of transfer for §547(c) purposes, because the issue was not before it, but noted that
§547(c)(2) had been amended to delete the requirement that payment be received within 45 days of the
date the underlying debt was incurred. Therefore, cases relying upon the statute's legislative history to
determine whether the date of delivery is significant may no longer be relevant. *Id.* However, as
explained below, whether the Transfers were made on the date of delivery or the date the check was
honored does not affect the result here.

the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the moving party has made a proper motion for summary judgment, the burden

shifts to the non-moving party, pursuant to Rule 56(e), which states, "[w]hen a motion for

summary judgment is made and supported as provided in this rule, an adverse party may not rest

upon the mere allegations or denials of the adverse party's pleading, but the adverse party's

response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing

that there is a genuine issue for trial. If the adverse party does not so respond, summary

judgment, if appropriate, shall be entered against the adverse party." Fed R. Civ. P. 56(e); *see*

*also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89

L. Ed. 2d 538 (1986). The party opposing the motion "must do more than simply show that there

is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

Before a court will find that a dispute about a material fact is genuine, there must be

sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The court must view the facts and draw inferences in a light most favorable to the non-moving

party. *Anderson*, 477 U.S. at 255. "[W]here the non-moving party's evidence contradicts the

movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co.*, 24 F.3d 508,

512 (3d Cir. 1994). It is not the role of the judge to weigh the evidence or to evaluate its

credibility, but to determine "whether there is a genuine issue for trial." *Anderson*, 477 U.S. at

249.

## DISCUSSION

Girtman argues that the"ordinary course of business" defense, set forth in Bankruptcy

Code §547(c)(2), applies to the Transfers and insulates them from avoidance under §547(b).[4]

Under §547(c)(2), the trustee may not avoid a transfer -

(2)    to the extent such transfer was - -
   (A)    in payment of a debt incurred by the debtor in the ordinary course of
          business or financial affairs of the debtor and the transferee;
   (B)    made in the ordinary course of business or financial affairs of the debtor
          and the transferee; and
   (C)    made according to ordinary business terms.

11 U.S.C. §547(c)(2).  The legislative history of this section provides that the "purpose of the

exception is to leave undisturbed normal financing relations, because it does not detract from the

general policy of the preference section to discourage unusual action by either the debtor or its

creditors during the debtor's slide into bankruptcy." *J.P. Fyfe, Inc. v. Bradco Supply Corp.*, 891

F.2d 66, 70 (3d Cir. 1989) *quoting* S.Rep. No. 989, 95th Cong., 1st Sess. 88, *reprinted* in 1978

U.S. Code Cong. & Admin. News 5787, 5874.

The ordinary course of business defense applies if the creditor can prove, by a

preponderance of the evidence, that all three elements of §547(c)(2) are satisfied. *J.P. Fyfe*, 891

F.2d at 69.  There is no dispute that the first element of §547(c)(2) is met (i.e., that the

transaction creating the debt is within the ordinary course of business dealings between the

parties). (Tr. at 17).[5]  Therefore, the issues remaining to be decided are: (i) whether the Transfers

---

[4]For the purpose of deciding Girtman's Summary Judgment Motion only, Girtman has assumed
that the Debtor can meet its burden under 11 U.S.C. §547(b). (Tr. at 15).

[5]The Debtor did not agree or disagree with the statement made at oral argument by Girtman's
counsel that there is no dispute as to the first element of the ordinary course of busines exception.  The
affidavits submitted by both parties in support of their respective motions indicate that Girtman supplied

were made in the ordinary course of business or financial affairs of the Debtor and Girtman, and

(ii) whether the Transfers were made according to ordinary business terms, that is, according to

standard industry practices.

<u>Whether the Transfers were within the ordinary course of business affairs
between the Debtor and Girtman (§547(c)(2)(B))</u>.

The second element of §547(c)(2) requires an inquiry into the "ordinariness" of the

transaction as between the parties. *Logan Square East v. Peco Energy Co.(In re Logan Square*

*East)*, 254 B.R. 850, 855 (Bankr.E.D.Pa. 2000). "Factors such as timing, amount and manner in

which a transaction was paid are considered relevant." *Id.* The *Logan Square* Court further

stated that the following criteria are also relevant in analyzing the second element of §547(c)(2):

(1)    the length of time the parties have engaged in the type of dealing at issue;
(2)    whether the subject transfer was in an amount more than usually paid;
(3)    whether the payments were tendered in a manner different from previous
payments;
(4)    whether there appears any unusual action by either the debtor or creditor to collect
or pay on the debt; and
(5)    whether the creditor did anything to gain an advantage in light of the debtor's
deteriorating financial condition.

*Logan Square*, 254 B.R. at 855. *See also Hechinger Liquidation Trust v. James Austin Co. (In re*

*Hechinger Investment Co. of Delaware, Inc.)*, 320 B.R. 541, 548 (Bankr.D.Del. 2004).

In support of its Summary Judgment Motion, Girtman submitted the affidavit of its

corporate secretary, Matthew Harris, in which Harris states that:

•    Girtman and the Debtor had a business relationship since 1998 (¶3);

---

doors and hardware for the Debtor's construction projects (Halliday Aff. ¶6, Harris Aff. ¶3), that Girtman
completed most of its work on the ESA projects (Halliday Aff. ¶18), and that Girtman invoiced the
Debtor after the Debtor placed an order (Harris Aff. ¶4). Taken together, the foregoing provides
evidence that the debts arose in the ordinary course of business affairs between the Debtor and Girtman.

- the Debtor normally paid Girtman's invoices in more than thirty (30) days (¶5);

- in 2003, the Debtor made 18 payments to Girtman ranging between 43 days to 365 days past the invoice date (¶6);

- that the average interval between the date on which Girtman issued an invoice to the Debtor and the date on which payment was received during their entire business relationship was sixty-three (63) days (¶ 7(b)); and

- the average interval between the date on which Girtman issued an invoice to the Debtor and the date on which payment was received during the preference period was fifty (50) days. (¶ 7(c)).[6]

In responding to Girtman's Motion for Summary Judgment, the Debtor argues that the payments were not within the ordinary course of business between the parties because Girtman's invoices stated that payment was due in thirty (30) days. (Response at ¶¶95-96.)  The Debtor also argues that the payments were not within the ordinary course of business between the parties because the Debtor intentionally "preferred" Girtman when it paid the invoices from ESA's August Payment.  The affidavit of David Halliday submitted by the Debtor states that:

- The Debtor needed the payments from ESA on the Plymouth Meeting Project to continue its operations (¶15);

- The Debtor used the August Payment from ESA to pay, primarily, only those creditors on the Plymouth Meeting Project who were continuing to provide new value on the project (¶17);

- Although Girtman had completed substantially all of its work on the project in June 2003, the Debtor paid Girtman's invoices from the August Payment because the Debtor was aware of a close relationship between ESA and Girtman, and the Debtor did not want to risk ESA's withholding of other payments if Girtman was not paid (¶¶18-19).

---

[6]In its response, the Debtor argued that the Harris Affidavit should be disregarded by the Court for failure to attach copies of the invoices on which it relied. On July 8, 2005, prior to the July 13th oral argument, Girtman amended the exhibit to his affidavit (docket no. 36) and supplied copies of the relevant invoices.

The first argument made by the Debtor (regarding the 30-day invoice terms) is not

persuasive. "[L]ate payments may be protected under the ordinary course of business exception

if those payments are the ordinary practice of the debtor and the other two elements of §547(c)(2)

are proven." *Reading China and Glass Co., Inc. v. Loomis Co. (In re Reading China and Glass*

*Co., Inc.)*, Civ.A.No. 91-8010, 1992 WL 55707, *2 (E.D.Pa. March 11, 1992) *citing Yurika*

*Foods Corp. v. United Parcel Service*, 888 F.2d 42, 44-45 (6th Cir. 1989). The Court in *Reading*

*China* wrote:

> The court should look for any significant variations from past proven ordinary practices,
> because significant variations would be evidence that the transaction was not in the
> ordinary course.... Payment terms at variance with the specified contract terms may be
> ordinary if the varied terms have become the ordinary practice between the parties.

*Reading China*, 1992 WL at *2 (citations omitted).

Here, Girtman presented evidence that the Debtor averaged 63 days between invoice date

and payment date throughout the parties' business relationship and that the Transfers at issue

were made, on average, 50 days after the invoice date.[7] I do not find this difference to be

significant. *See Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 498 (8th Cir. 1991)(deciding that

an average of 62 days between invoice date and payment date during the 12 months prior to

bankruptcy, and an average of 52 days between invoice date and payment date during the

preference period, was not "sufficiently significant to show that the payments during the 90-day

---

[7]Upon my own review of the submissions, it appears that the Transfers at issue were made, on
average, 48 days after invoice date (if counting from the check date) and about 60 days after invoice date
(if counting from the payment date). The range of 48 - 60 days (which is a difference of 3 to 15 days
from the pre-petition average) is not so significant that it places the Transfers outside of the ordinary
business affairs of the parties.

8

period did not follow the ordinary course of business reflected in the prior 12 months.")[8]

Furthermore, a review of the interval between invoice date and payment date as set forth in Girtman's invoice summaries for jobs with the Debtor shows that such intervals varied as follows:

| Job Number | Interval between invoice date and payment date[9] |
|---|---|
| EO8902        (2002-03) | 36 - 82 days |
| E26301        (2002-03) | 5 - 189 days |
| 23901         (2002-03) | 57 - 98 days |
| 22601         (2001-03) | 38 - 75 days |
| 08600         (2000-01) | 35 - 297 days |
| 22198         (1998-99) | 32 - 360 days |

In *Off'l Committee of Creditors v. Winner Steel Services (In re J. Allan Steel Co.)*, 321

---

[8]Courts have determined that the following differences between pre-preference period payment and preference payments were *not* within the ordinary course of business: *See Concast Canada, Inc. v. Laclede Steel Co. (In re Laclede Steel Co.)*, 271 B.R. 127 (B.A.P. 8th Cir. 2002)(Late payment of 177 days beyond invoice date during the preference period was not in the parties' ordinary course of business, when the average time prior to the preference period was 52 days, although one payment was as late as 70 days); *Hassett v. Altai, Inc. (In re CIS Corp.)*, 214 B.R. 108, 120 (Bankr.S.D.N.Y. 1997)(The court concluded that payments that were, on average, 80 days past the due date during the preference period were not within the parties' ordinary course of business when, during the pre-preference period, the Debtors payments that were, on average, 51 days late. The Court noted that a one-month difference between the preference period and pre-preference period payments was not trivial, and further decided that three pre-preference period invoices - - that were paid as late as 112, 142 and 189 days after the due date - - did not establish an ordinary course of conduct between the parties); and *Off'l Committee of Unsecured Creditors v. Sabrina S.P.A. (In re R.M.L., Inc.)*, 195 B.R. 602, 614 (Bankr.M.D.Pa. 1996)(The court determined that payments made on an average of 94 days late during the preference period were not within the parties' ordinary course of business, when the evidence showed that invoices were paid, on average, 30-32 days late during the pre-preference period).

[9]When determining the range between invoice date and payment date from the invoice summaries supplied by Girtman, I excluded the post-petition payments made on February 27, 2004 for certain invoices on job numbers 23901, E26301, and E08902, since those payments were made after the Debtor sought bankruptcy relief and clearly were not in the ordinary course of the Debtor's business.

B.R. 764 (Bankr.W.D.Pa. 2005), the court recognized that the business of steel processors was

cyclical and could vary considerably from year to year. *Allan Steel*, 321 B.R. at 771. The *Allan*

*Steel* Court held that the parties met the subjective test of §547(c)(2)(B) when the evidence

showed that the payments in the preference period were made 66 days after invoice date, and the

creditor proved that interval of payment between the parties historically was as follows:

| | |
|---|---|
| Year 1 prior to bankruptcy filing | 41-79 days |
| Year 2 prior to bankruptcy filing | 33-54 days |
| Year 3 prior to bankruptcy filing | 43-57 days |
| Year 4 prior to bankruptcy filing | 4 - 121 days |
| Year 5 prior to bankruptcy filing | 30-72 days |

*Allan Steel,* 321 B.R. at 771.    The preference payments in the *Allan Steel* case fell within the

payment range of the first, fifth and fourth years prior to bankruptcy and was not significantly

different from the range set in the second and third years prior to bankruptcy. *Id.* In the matter

before me, the intervals between invoice date and payment date of the Transfers were 53, 70 and

59 days, respectively. These dates fall within the range of payment dates on the other jobs

between the Debtor and Girtman.

Girtman's evidence demonstrates that the parties rarely complied with the 30-day terms

set forth in the invoice. Whether the Transfers are viewed together (by calculating the average

number of days for payment), or are viewed individually (by determining the interval between

each Transfer's invoice date and payment date), I conclude that the three Transfers were paid

within a similar range of "lateness" that was within the parties' ordinary course of business

affairs for previous jobs.

10

Applying the other factors of a §547(c)(2)(B) analysis to this matter likewise supports the

conclusion that the Transfers were within the parties' ordinary course of business dealings. The

amount and manner of payment for the Transfers do not appear to be unusual. Girtman's invoice

summaries show that the Debtor often paid more than one invoice on the same date. The Debtor

claims that it actually "preferred" Girtman by paying its invoices, although Girtman had little

"new value" to contribute on the Plymouth Meeting Project. However, no evidence was

submitted to indicate that Girtman was pressuring the Debtor for payment or taking any measures

to gain advantage over other creditors. The Debtor's decision to pay Girtman was based upon an

assumption that a third party *might* react by withholding payment. This averment, without more,

is too attenuated for me to draw any inference in favor of the Debtor's position. The evidence

submitted demonstrates that the Transfers were made within the parties' ordinary course of

business.

Whether the Transfers were made according to ordinary business terms (§547(c)(2)(C)).

In the case *Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical

Products, Inc.)*, 18 F.3d 217 (3d Cir. 1994), the Third Circuit Court of Appeals considered, in

detail, the final element of the ordinary course of business defense. The Court cited favorably to

the Seven Circuit Court of Appeals' analysis of this element, as follows:

> "ordinary business terms" refers to the *range* of terms that encompasses the
> practices in which firms similar in some general way to the creditor in question
> engage, and that only dealings so [unusual] as to fall outside that broad range
> should be deemed extraordinary and therefore outside the scope of subsection C.

*Molded Acoustical Products*, 18 F.3d at 224 *quoting In re Tolona Pizza Prods. Corp.*, 3 F.3d

1029, 1033 (7th Cir. 1993).[10]  However, in recognition that "the duration of the parties'

relationship is logically pertinent to the touchstone of the statutory policies undergirding

§547(c)(2)" (*Molded Acoustical Products*, 18 F.3d at 224), the Third Circuit further refined the

standard for §547(c)(2)(C) as follows:

> [W]e read subsection C as establishing a requirement that a creditor prove that the debtor
> made its pre-petition preferential transfers in harmony with the range of terms prevailing
> as some relevant industry's norms.  That is, subsection C allows the creditor considerable
> latitude in defining what the relevant industry is, and even departures from that relevant
> industry's norms which are not so flagrant as to be "unusual" remain within subsection
> C's protection.  In addition, when the parties have had an enduring steady relationship,
> one whose terms have not significantly changed during the pre-petition insolvency period,
> the creditor will be able to depart substantially from the range of terms established under
> the objective industry standard inquiry and still find a haven in subsection C.

*Molded Acoustical Products*, 18 F.3d at 226.

To satisfy its burden of proof with respect to the third element of the ordinary course of

business defense, Girtman submitted expert testimony through an affidavit by Gary Kufner, in

which he stated that:

- in the construction industry, most invoices provide that payment is due in thirty
  days, and may provide for a 2% discount for payments made within ten days
  (¶22);

- it is very rare for payments to be made according to the strict terms of an invoice
  in the construction industry (¶23);

- payments are generally made within thirty to sixty days after invoicing , although
  this time frame may be misleading because it includes payments made within the
  ten day discount period (¶23-24)

- if you exclude payments made within the ten day discount period, payment in the
  industry is normally made in greater than sixty days (¶25);

---

[10]The Third Circuit adopted the *Tolona Pizza* analysis, but substituted the word "unusual" for
"idiosyncratic," which is used in *Tolona Pizza*. *Molded Acoustical Products*, 18 F.3d at 224.

- his review of Girtman's accounting records related to the transactions with the Debtor showed that payments were made anywhere between 36 and 83 days after invoicing (¶28, ¶30);

- the payments between the Debtor and Girtman, both before the preference period and during the preference period, are consistent with the practices within the industry in terms of timing of the payments (¶31).

Relying on Kufner's affidavit, Girtman argues that the Transfers fit within the range of time in which payments typically are made in the construction industry. Girtman also argues that its business relationship with the Debtor "remained relatively stable leading into and throughout the insolvency period" because the average interval between the date on which Girtman issued an invoice and the date on which it received payment from the Debtor during the preference period was 50 days and the average interval during the entire relationship was 63 days.

In its response, the Debtor argues that the Kufner Affidavit is inadmissible because it offers no evidentiary foundation or any specific factual data for its conclusory assertions. (Response at ¶104.)  While Kufner's affidavit does not reveal specific underlying data upon which Kufner may have relied, Kufner's statements are also based on his experience in the industry, which experience has not been challenged. The Debtor, on the other hand, has not submitted any opposing expert affidavit or other evidence to rebut the Debtor's submission as to the industry standard. When the Debtor fails to offer at least some evidence of a different industry standard, the Debtor fails to meet its burden on summary judgment. Pursuant to Fed.R.Bankr.P. 7056(e), the Debtor is required to set forth specific facts showing that there is a genuine issue for trial and has failed to do so.

13

## SUMMARY

Girtman has satisfied all elements of the ordinary course of business defense required by

11 U.S.C. §547(c)(2); there remain no genuine issues as to any material fact.  I will grant

Girtman's motion for summary judgment and deny the Debtor's cross-motion for summary

judgment.[11]   An appropriate Order follows.

BY THE COURT:

Nov. 4, 2005

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

---

[11]Girtman's Motion in Limine to preclude expert testimony by the Debtor will be denied as moot.

14

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re: | : | |
| | : | Chapter 11 |
| **WINDSOR CONSTRUCTORS** | : | |
| **INCORPORATED,** | : | |
| | : | Bky No. 03-36589 (KJC) |
| Debtor. | : | |
| | : | |
| | : | |
| | : | |
| **WINDSOR CONSTRUCTORS** | : | |
| **INCORPORATED,** | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| **GIRTMAN & ASSOCIATES, INC.** | : | Adversary Proc. No. 04-158 (KJC) |
| | : | |
| Defendant | : | |
| | : | |

## ORDER

**AND NOW,** this 4th day of November, 2005, upon consideration of the Motion for Summary Judgment filed by the defendant, Girtman & Associates, Inc. ("Girtman"), (docket no. 26), and the Debtor's response to Girtman's summary judgment motion and cross-motion for summary judgment (docket no. 29), and the respective responses and briefs submitted by both parties, and after oral argument, and for the reasons set forth in the accompanying Memorandum, it is hereby **ORDERED** that:

1.  Girtman's motion for summary judgment is hereby **GRANTED** and judgment is entered in favor of the defendant, Girtman & Associates, Inc.;

2.  The Debtor's cross-motion for summary judgment is hereby **DENIED**; and

3.      Girtman's motion in limine to preclude expert testimony (docket no. 32) is hereby

**DENIED** as moot.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Copies to:

Windsor Constructors Inc.
7137 Old Easton Road
Pipersville, PA 18947

Gerald J. McConomy, Esquire
Knapp McConomy Merlie LLP
1216 Route 113
P.O. Box 487
Chester Springs, PA 19425

Robert Bovarnick, Esquire
Law Offices of Robert M. Bovarnick
Two Penn Center Plaza
1500 JFK Boulevard, Suite 1310
Philadelphia, PA 19102

Frederic J. Baker, Sr., Esquire
Senior Assistant United States Trustee
833 Chestnut Street, Suite 500
Philadelphia, PA 19107

Timothy B. McGrath, Clerk, U. S. Bankruptcy Court
Pamela Blalock, Courtroom Deputy Clerk

2